*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0085p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RICHARD WADE COOEY, II,

> *Plaintiff-Appellee,*

*v.*

No. 05-4057

TED STRICKLAND, Governor; TERRY J. COLLINS,
Director; E. C. VOORHIES, Warden,

> *Defendants-Appellants.*

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 04-01156—Gregory L. Frost, District Judge.

Argued: December 7, 2006

Decided and Filed: March 2, 2007

Before: SUHRHEINRICH, SILER, and GILMAN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Michael L. Collyer, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for
Appellants. Gregory W. Meyers, PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellee.
**ON BRIEF:** Michael L. Collyer, Kelley A. Sweeney, OFFICE OF THE ATTORNEY GENERAL,
Cleveland, Ohio, for Appellants. Gregory W. Meyers, Kelly L. Culshaw, Kimberly S. Rigby,
PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellee.

SUHRHEINRICH, J., delivered the opinion of the court, in which SILER, J., joined.
GILMAN, J. (pp. 12-17), delivered a separate dissenting opinion.

---

## OPINION

---

SUHRHEINRICH, Circuit Judge. Richard Cooey, an Ohio inmate under sentence of death,
filed this action against Ted Strickland, Governor, Terry J. Collins, Director, and E. C. Voorhies,
Warden (collectively "Defendants" or "State") pursuant to 42 U.S.C. § 1983, challenging the
constitutionality of Ohio's lethal injection protocol. The issues before us in this interlocutory appeal
are (1) whether a death row inmate's claim against lethal injection itself–as opposed to a precursor
procedure–is properly considered to be a habeas action or one brought pursuant to 42 U.S.C. § 1983,
(2) whether a death row inmate's § 1983 method-of-execution challenge accrues, for statute of
limitations purposes, when execution is imminent or at some earlier stage in state and federal

1

proceedings, and  (3) whether *res judicata* is a bar to a death row inmate's claim concerning the means and methods of execution when similar issues were raised, or the specific claim could have been raised, in a previous habeas action.

## I. Background

In 1986, an Ohio three-judge panel convicted Cooey of two counts of aggravated murder, and the panel sentenced him to death.  The Ohio Supreme Court affirmed Cooey's convictions and sentence on direct appeal.  *See State v. Cooey*, 544 N.E.2d 895 (Ohio 1989), and the United States Supreme Court denied certiorari on April 1, 1991, *see Cooey v. Ohio*, 499 U.S. 954 (1991).  Cooey unsuccessfully sought post-conviction relief pursuant to Ohio Rev. Code Ann. § 2953.21.  *See State v. Cooey*, 1994 WL 201009 (Ohio Ct. App. May 25, 1994).  The Ohio Supreme Court declined jurisdiction over his further appeal from this decision.  Cooey subsequently sought to reopen his direct appeal on the basis of ineffective assistance of appellate counsel.  The Ohio Court of Appeals denied his request to reopen on the basis of procedural default because Cooey had not established good cause for not filing his application to reopen within ninety days of the July 1, 1993, effective date of Ohio App. R. 26(B).  The Ohio Supreme Court affirmed.  *See State v. Cooey*, 653 N.E.2d 252 (Ohio 1995).

In October 1996, Cooey filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254.  The district court denied the petition on September 4, 1997.  *See Cooey v. Anderson*, 988 F. Supp. 1066 (N.D. Ohio 1997).  This Court granted a certificate of appealability as to two issues and denied relief as to both.  *See Cooey v. Coyle*, 289 F.3d 882 (6th Cir. 2002).  The United States Supreme Court denied *certiorari* on March 31, 2003.  Ohio originally set Cooey's execution date for July 24, 2003.

On July 21, 2003, Cooey filed a motion for relief from judgment pursuant to Fed. R. Civ. P. 60(b) and a motion for stay of execution.  On July 23, 2003, the district court granted Cooey's motion for a stay of execution and deferred ruling on the Rule 60(b) motion.  Both the Sixth Circuit and the Supreme Court denied the Warden's motions to vacate the stay of execution.  The district court ultimately denied the Rule 60(b) motion, and this Court denied Cooey's application for a certificate of appealability from the denial of his Rule 60(b) motion and his motion for leave to file a second or successive habeas petition.

On June 10, 2004, Cooey and another inmate, Adremy Dennis, filed a complaint alleging that the lethal injection protocol constitutes cruel and unusual punishment in violation of the Eighth Amendment.  Ohio utilizes three drugs in performing lethal injection:  sodium thiopental, pancurionium bromide, and potassium chloride.  The sodium thiopental is designed to anesthetize the prisoner and render him unconscious.  Next, the pancuronium bromide paralyzes all of the prisoner's voluntary muscles but does not affect his sensation, consciousness, or ability to feel pain.  Finally, the potassium chloride induces cardiac arrest.  Dennis and Cooey asserted that if the sodium thiopental is not administered properly and in sufficient dosage, the prisoner could experience intense pain after being injected with the potassium chloride, but would be unable to convey the sensation due to the paralyzing agent in pancuronium bromide.  They also maintained that to subject the prisoner to such excruciating pain while he is still conscious would amount to cruel and unusual punishment.  They also alleged that the personnel attending to the executions are inadequately trained and, as such, Defendants' execution methods would violate a prisoner's constitutional rights.

   The district court dismissed the complaint because Cooey failed to exhaust his administrative remedies. After exhausting them, Cooey re-filed his complaint on December 8, 2004.[1] On January 4, 2005, Defendants moved to dismiss the complaint based on the statute of limitations and *res judicata*, in addition to arguing that Cooey's complaint should be construed as a successive habeas petition. On March 28, 2005, the district court denied the defendants' motion but granted them permission to pursue this interlocutory appeal. On March 30, 2005, Defendants asked the district court to certify for immediate appeal the three arguments made in their motion to dismiss. On April 13, 2005, the district court granted the motion, in part, as to the issue of whether Cooey's claims are barred by the statute of limitations. Defendants then sought permission to appeal the three issues pursuant to 28 U.S.C. § 1292(b). This Court granted the request as to all three issues.

   We later granted a stay pending the Supreme Court's decision in *Hill v. McDonough*, 126 S. Ct. 2096 (2006), which was decided on June 12, 2006. After that decision, the parties filed supplemental briefs addressing its impact on this case. The parties also submitted second supplemental briefs discussing the impact of recent changes in Ohio's lethal injection protocol on the issues pending before this Court. The matter was argued before this Court on December 7, 2006.

## II. Analysis

   This Court reviews *de novo* the district court's grant or denial of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005), *cert. denied,* 126 S. Ct. 1911 (2006). In this analysis, we must construe the complaint in the light most favorable to the plaintiff, accept all of his factual allegations, and determine whether he undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995).

## A. § 1983 vs. § 2254

   Cooey sought relief pursuant to 42 U.S.C. § 1983, alleging that the proposed lethal injection protocol would constitute cruel and unusual punishment in violation of the Eighth Amendment. In their motion to dismiss, Defendants argued that Cooey's claim should have been presented in a petition for a writ of habeas corpus under 28 U.S.C. § 2254, rather than as a § 1983 claim. In *Hill*, the Supreme Court addressed this same issue and concluded that a death penalty plaintiff could raise his challenge in a § 1983 action. Relying on its earlier decision in *Nelson v. Campbell*, 541 U.S. 637, 645-47 (2004), the Court concluded that the plaintiff's action was properly brought under § 1983 because it did not present a general challenge to his execution by lethal injection, but rather limited the challenge to the specific protocol currently used by the defendants. *Hill*, 126 S.Ct. at 2101-02. In their supplemental brief, Defendants acknowledge that *Hill* defeats their argument.

## B. Timeliness

   Defendants also argue that Cooey's § 1983 action is barred by the statute of limitations. The Supreme Court has held that § 1983 claims are best characterized as tort actions for the recovery of damages for personal injury and that federal courts must borrow the statute of limitations governing personal injury actions from the state where the § 1983 action was brought. *Wilson v. Garcia*, 471 U.S. 261, 275-76 (1985). If a state has more than one statute of limitations for personal injuries, the state's residual or general statute of limitations governing personal injury actions is applied to all § 1983 actions brought in that state. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989). This Court has held that a two-year statute of limitations applies to § 1983 claims in Ohio. *Banks v. City of*

---

[1]Dennis re-filed his complaint on September 27, 2004. Cooey did not join in this filing. Dennis also re-filed his request for a preliminary injunction, which the district court denied on September 29, 2004. This Court upheld the denial of the injunction and Dennis was subsequently executed.

*Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003) (citing *Browning v. Pendleton*, 869 F.2d 989 (6th Cir. 1989) (en banc)).

On the other hand, as the Supreme Court recently made clear, federal law determines when the statute of limitations for a civil rights action begins to run. *Wallace v. Kato*, – S. Ct. –, No. 05-1240, 2007 WL 517122, at *3 (Feb. 21, 2007). "Under those principles, it is 'the standard rule that [accrual occurs] when the plaintiff has complete and present cause of action.'" *Wallace*, 2007 WL 517122, at *3 (quoting *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal*, 522 U.S. 192, 201 (1997)). This occurs "when 'the plaintiff can file suit and obtain relief.'" *Id.* (quoting *Bay Area Laundry*, 522 U.S. at 201).

This Court has previously stated that "[u]nder federal law, as developed in this Circuit, the statute of limitations period begins to run when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred." (6th Cir. 2001); *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996); *Ruff v. Runyon*, 258 F.3d 498, 500-01 (6th Cir. 2001) (same); *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984). Stated differently, "[i]n determining when the cause of action accrues in § 1983 cases, we look to the event that should have alerted the typical lay person to protect his or her rights." *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 856 (6th Cir. 2003). We must therefore look at when the harm in question occurred, guided by the principle that "[a] plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence." *Sevier*, 742 F.2d at 273.

Defendants have the burden of demonstrating that the statutory period had run before Cooey filed his action. *Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002). We review *de novo* the district court's conclusion that Cooey's complaint was filed within the applicable statutory period. *Kelly v. Burks*, 415 F.3d 558, 560 (6th Cir. 2005).

Cooey was sentenced to death in 1986. His conviction and sentence were affirmed by the Ohio Supreme Court on direct appeal in 1989, and the United States Supreme Court affirmed in 1991. Lethal injection became available as a means of execution in Ohio in 1993. In 2001, it became Ohio's sole method of execution.[2] This Court denied federal habeas relief in 2002, and the United States Supreme Court denied certiorari on March 31, 2003. Cooey's execution date was set for July 24, 2003.

The record also reflects that, at least as early as April 2002, information about the protocol was available upon request. Attached to Cooey's complaint is a letter dated April 19, 2002, from Warden Haviland disclosing the chemical mixture and equipment to be used.[3] *See also* Deborah W.

---

[2] In 1993, a bill was passed into law granting prisoners the option to choose between death by electrocution or lethal injection, with electrocution as the "default" method. *See* Ohio Rev. Code § 2949.22(A)-(B) (2000). In 2001, Ohio made lethal injection the sole method of execution. *See* Ohio Rev. Code § 2949.22(A) (amending Ohio Rev. Code Ann. § 2949.22(A) (West 2000)).

[3] The letter states in relevant part:

> The intravenous equipment was purchased from a commercial source and consisted of:
>
> 01). Angiocath Abbocath-7
>
> 02). Primary IV Set No. 1820 (70 inch)
>
> 03). 0.9%(?) Sodium Chloride, 1000m.
>
> The generic names of the pharmaceuticals used are:

Denno, *When Legislatures Delegate Death:   The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What it Says About Us*, 63 Ohio St. L.J. 63, 146 (2002) (explaining that as of 2001, Ohio had a vague written policy, but that more specific information was available upon request); Mary Beth Lane, "How State Plans to Kill Berry; Execution to Take About Six Minutes" *Cleveland Plain Dealer* (February 17, 1999) (describing the three drugs in the lethal injection protocol, which a nine-page DRC policy and state officials explained).  A follow-up letter from staff counsel for the Ohio Department of Rehabilitation and Correction dated May 30, 2002, further describes the procedures used by prison personnel in performing lethal injection and the quantities used under this formulation.[4]

The district court concluded that Cooey's claim accrued when his execution became imminent and he knew or had reason to know of the facts that gave rise to his specific method-of-execution challenge.  In defining when an execution becomes imminent, the district court stated that it was "of the view that an execution becomes imminent not necessarily when an execution date is set, but when all other legal challenges to the validity of a death sentence come to an end, *i.e.*, when the plaintiff has exhausted all of his state and federal avenues of relief."  This occurs "when the United States Supreme Court denies *certiorari* in the plaintiff's habeas corpus proceeding or otherwise issues a decision foreclosing federal habeas corpus relief."  In determining when a plaintiff knows or has reason to know the facts giving rise to his specific method-of-execution claim, the district court stated that because Ohio's protocol is a creation of the Ohio Department of Rehabilitation and Correction, and therefore subject to change until the time of execution,

> requiring a death-sentenced plaintiff to file his method-of-execution challenge any sooner . . . [would be] wasteful and possibly absurd, given the possibility that, prior to his execution becoming imminent, a plaintiff could see his conviction or death sentence reversed, or the alteration of the precise execution protocol that plaintiff might seek to challenge as unconstitutional.

Applying this test to Cooey, the district court concluded that "Cooey knew or had reason to know of the facts giving rise to the specific allegations he has presented in the instant complaint in

---

       01).  Pancuronium Bromide

       02).  Potassium Chloride

       03).  Thiopental Sodium

There is no cardiac monitoring equipment used other than a stethoscope.

[4]The May 30, 2002 letter from the Ohio Department of Rehabilitation and Correction provides in pertinent part:

      The execution team begins rehearsing the procedure thirty days from the execution date.  On the day of the execution, saline locks are placed in each of the prisoner's arms prior to entering the death chamber.  After the prisoner has been placed on the execution bed, tubing for the delivery of the chemicals is attached to each lock.  The chemicals are administered via hand infusion.  Persons performing these functions have been certified as either a licensed practical nurse, paramedic or phlebotomy technician.  The chemicals are infused into one arm.  If the arm becomes unavailable, the other arm would be used.  A Medical Doctor has pronounced death.

      The drugs are administered in the following dosages:  two grams of thiopental sodium in normal saline concentration; one hundred milligrams of pancuronium bromide in normal saline concentration; and 100 milliequivalents of potassium chloride in normal saline concentration.  The thiopental sodium and pancuronium bromide are purchased from a local pharmacy.  The institution pharmacy purchases the drugs.  It turns the drugs over to the Warden and keeps a record of receipt and usage.  Purchase and record keeping procedures have been coordinated with the Drug Enforcement Agency and the Ohio State Board of Pharmacy.

May 2002" when he received information about the protocol, and that his execution became imminent when the United States Supreme Court denied *certiorari* as to his habeas corpus proceedings on March 31, 2003; "[thus, Cooey] had two years from that date to file his method-of-execution claim." Because Cooey filed the instant action on December 8, 2004, three months before the expiration of the statute of limitations, the district court deemed his cause of action was timely.

The district court also commented that, as the protocol was not established by statute or administrative rule, it was subject to change at any time before the execution. Because Defendants could change the protocol up to the time of an inmate's execution, the district court believed that it would be premature to challenge the protocol until the execution was imminent.

On appeal, Defendants argue that the statute of limitations began to run in 1993, when lethal injection became available as a means of execution in Ohio, or alternatively in 2001, when lethal injection became Ohio's sole method of execution. Defendants assert that it is the issuance of a government order, in this case the protocol, rather than the carrying out of that order, which starts the clock. Cooey urges us to affirm the district court's conclusion that his claim accrued on March 31, 2003, when the United States Supreme Court denied certiorari as to Cooey's first habeas petition and after his execution date was set.

Setting an accrual date at the point when the actual harm is inflicted, i.e., at the point of execution, is problematic in this context because the death-sentenced inmate's claim would not accrue until he was executed, at which time it would also be simultaneously moot. In any event, both *Nelson* and *Hill* establish inferentially that § 1983 method-of-execution challenges may be brought before the execution is carried out. Neither case, however, addressed the appropriate accrual date. Thus, the relevant "event that should have alerted a lay person to protect his rights" must be redefined here.

If the point of infliction is not a viable option, the most logical choice of a triggering event is the point when the death penalty is ordered, upon judgment of conviction and sentence. At least one Court has set the accrual date at the conclusion of direct review by the state. *See Neville v. Johnson*, 440 F.3d 221, 222 (5th Cir. 2006) (per curiam) (holding, in reliance on a concession by the state, that a challenge to a method of execution may be filed any time after the plaintiff's conviction has become final on direct review).[5] This is also an attractive choice because it marks the point at which the state has rendered its criminal judgment final and, absent collateral civil proceedings, the point at which the state sets the execution date. Furthermore, the death-sentenced inmate can file suit and obtain relief.

The district court's conclusion that the accrual date occurs when execution is imminent and all state and federal remedies have been exhausted is problematic for several reasons. First, it subverts the purpose of statutes of limitations, which are designed to "promote judicial economy and protect defendants' rights." *John Hancock Fin. Servs., Inc. v. Old Kent Bank*, 346 F.3d 727, 734 (6th Cir. 2003) (and also noting that the discovery rule "has been applied to prevent unjust results when a plaintiff would otherwise be denied a reasonable opportunity to bring suit due to the latent nature of the injury or the inability to discover the causal connection between the injury and the defendant's action" (internal quotation marks omitted)). As the Supreme Court noted in *Wallace:*

---

[5]*Neville* cites *White v. Johnson*, 429 F.3d 572, 574 (5th Cir. 2005) (per curiam), as support for this proposition. However, the reference to *White* is merely a concession by the state that when an inmate's conviction became final on direct review, his challenge to the method of execution would have been appropriately filed at any time thereafter. *See White*, 429 F.3d at 574 ("The State concedes that when Harris's conviction became final on direct review, his challenge to the State's method of execution, in the absence of dramatic changes to the State's protocol–would have been appropriately filed at any time thereafter and need not await an imminent execution date.").

> "Under the traditional rule of accrual ... the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages. The cause of action accrues even though the full extent of the injury is not then known or predictable." 1 C. Corman, Limitation of Actions § 7.4.1, pp. 526-527 (1991) (footnotes omitted); see also 54 C.J.S., Limitations of Actions § 112, p. 150 (2005). Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief.

*Wallace*, 2007 WL 517122, at *4.

More fundamentally, setting an accrual date at the point of imminency plus exhaustion of federal collateral remedies adds a significant period of delay to a state's ability to exercise its sovereign power and to finalize its judgments, which disrupts the vital yet delicate balance between state and federal relations. "Our federal system recognizes the independent power of a State to articulate societal norms through criminal law; but the power of a State to pass laws means little if the State cannot enforce them." *McCleskey v. Zant,* 499 U.S. 467, 492 (1991). Furthermore, "a State retains a significant interest in meting out a sentence of death in a timely fashion." *Nelson*, 541 U.S. at 644.

Of course, "[f]ederal habeas review of state convictions frustrates both the States' sovereign power to punish offenders and their good faith-attempts to honor constitutional rights." *Calderon v. Thompson*, 523 U.S. 538, 555-56 (1998) (internal quotation marks omitted). For this reason, federal habeas review of state court judgments is limited. As the Supreme Court observed in *Calderon*:

> In light of "the profound societal costs that attend the exercise of habeas jurisdiction," *Smith v. Murray*, 477 U.S. 527, 539 . . . (1986), we have found it necessary to impose significant limits on the discretion of federal courts to grant habeas relief. See, *e.g., McClesky v. Zant*, 499 U.S. 467, 487 . . . (1991) (limiting "a district court's discretion to entertain abusive petitions"); *Wainwright v. Sykes*, 433 U.S. 72, 90-91 . . . (1977) (limiting courts' discretion to entertain procedurally defaulted claims); *Teague v. Lane*, 489 U.S. 288, . . . 308-10 (1989) (plurality opinion of O'CONNOR, J.) (limiting courts' discretion to give retroactive application to "new rules" in habeas cases); *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 . . . (1993) (limiting courts' discretion to grant habeas relief on the basis of "trial error").

*Id.* at 554-55. The Court added that "[t]hese limits reflect our enduring respect for "the State's interest in the finality of convictions that have survived direct review within the state court system." *Id.* at 555 (citation omitted).

The Antiterrrorism and Effective Death Penalty Act of 1996 reflects Congress's desire to restore and maintain the proper balance between state criminal adjudications and federal collateral proceedings. *See generally Rhines v. Weber*, 544 U.S. 269, 274 (2005) (stating that "[t]he enactment of AEDPA in 1996 dramatically altered the landscape for federal habeas corpus petitions").

> There is no doubt Congress intended AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] to advance [the] doctrines [of comity, finality, and federalism]. Federal habeas corpus principles must inform and shape the historic and still vital relation of mutual respect and common purpose existing between the States and the federal courts. In keeping this delicate balance we have been careful to limit the

scope of federal intrusion into state criminal adjudications and to safeguard the
States' interest in the integrity of their criminal and collateral proceedings.

*Williams v. Taylor*, 529 U.S. 420, 436 (2000); *see also Woodford v. Garceau*, 538 U.S. 202, 206
(2003) ("Congress enacted AEDPA to reduce delays in the execution of state and federal criminal
sentences, particularly in capital cases, . . . and to further the principles of comity, finality, and
federalism."(internal quotes omitted)); *Williams v. Taylor*, 529 U.S. 362, 386 (2000) (Stevens, J.,)
(stating that "Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give
effect to state convictions to the extent possible under law"); *see also id.* at 404 (majority opinion).
In addition to revising the standards for evaluating the merits of a habeas application, *see* 28 U.S.C.
§ 2254(d) (1996) (providing that a writ of habeas corpus shall not be granted to a state prisoner
unless the state court proceedings "resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law," or "resulted in a decision that was
based on an unreasonable determination of the facts in light of the evidence presented in the State
court proceedings"), the AEDPA created a one-year statute of limitations for filing a federal habeas
petition, running from "the date on which the judgment became final by the conclusion of direct
review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A) (1996).
*See generally Day v. McDonough*, 126 S. Ct. 1675, 1680 n.1 (2006) (noting that "[u]ntil AEDPA
took effect in 1996, no statute of limitations applied to habeas petitions"). The one-year limitation
period "quite plainly serves the well-recognized interest in the finality of state court judgments . . .
[and] reduces the potential for delay on the road to finality by restricting the time that a prospective
federal habeas petitioner has in which to seek federal habeas review." *Duncan v. Walker*, 533 U.S.
167, 179 (2001) (internal citation omitted); *see also Acosta v. Artuz*, 221 F.3d 117, 123 (2d Cir.
2000) ("The AEDPA statute of limitation promotes judicial efficiency and conservation of judicial
resources, safeguards the accuracy of state court judgments by requiring resolution of constitutional
questions while the record is fresh, and lends finality to state court judgments within a reasonable
time." (quoted with approval in *Day v. McDonough*)).

        The concerns articulated by the Supreme Court both pre- and post-AEDPA, and by Congress
in the AEDPA itself, apply with equal force in this case, which "fall[s] at the margins of habeas."
*Nelson*, 541 U.S. at 646 (noting that the method-of-injection challenges "fall at the margins of
habeas"). Indeed, the Court's recent decisions in *Hill* and *Nelson* reflect this core concern that
federal habeas should not displace a state's authority to execute its judgments. In *Nelson*, the
Supreme Court stated that "method-of execution" challenges should be "brought at such a time as
to allow consideration of the merits, without requiring the entry of a stay." 541 U.S. at 650; *see
also Gomez v. U. S. Dist. Court*, 503 U.S. 653, 654 (1992) (criticizing inmate for filing "method-of-
execution" challenge pursuant to 42 U.S.C. § 1983 more than a decade after the completion of his
direct appeal, and shortly before his execution); *White v. Johnson*, 429 F.3d 572, 574 (5th Cir. 2005)
(per curiam) (rejecting an inmate's § 1983 "method-of-execution" challenge where the inmate had
"been on death row for more than six years"). Most recently, in *Hill*, the Supreme Court
emphasized that filing a § 1983 action challenging the constitutionality of certain aspects of a state's
execution does not "entitle the complainant to an order staying [his] execution as a matter of
course." *Hill,* 126 S. Ct. at 2104. The Court added that "[b]oth the State and the victims of [the]
crime have an important interest in the timely enforcement of [the] sentence." *Id.* Thus, an inmate
intending to assert such a challenge generally must file his suit in sufficient time to "allow
consideration of the merits, without requiring entry of a stay" of execution. *Id.* (quoting *Nelson*, 541
U.S. at 650). The *Nelson* Court also stated "flat out" that "[t]he federal courts can and should
protect States from dilatory or speculative suits." *Rutherford v. McDonough*, 466 F.3d 970, 974
(11th Cir. 2006) (quoting *Hill*, 126 S.Ct. at 2104). This Court adheres to these principles. *See, e.g.,
Hicks v. Taft*, 431 F.3d 916 (6th Cir. 2005) (pre-*Hill*, cited with approval in *Hill*; ruling that a last-
minute petition by a death row inmate, filed six days before his scheduled execution, was not
entitled to a stay of execution even though the district court had allowed him to intervene if a fellow

inmate's § 1983 challenge to Ohio's lethal injection protocol); *Alley v. Little*, 186 Fed. App'x 604, (6th Cir.), *reh'g en banc denied*, 452 F.3d 621 (6th Cir.), *cert. denied*, 126 S. Ct. 2975 (2006).

Thus, since the "date" the lethal injection protocol is imposed is infeasible, it stands to reason that the next most appropriate accrual date should mirror that found in the AEDPA: upon conclusion of direct review in the state court or the expiration of time for seeking such review. *See* 28 U.S.C. § 2244(d)(1)(A) (1996).[6] All of the same concerns articulated by the Supreme Court and as reflected in the AEDPA are relevant here. Like federal habeas actions, a § 1983 method-of-execution challenge "implicates values beyond the concerns of the parties." *See Acosta*, 221 F.3d at 123 (and noting that the AEDPA statute of limitation was Congress' primary vehicle for streamlining the habeas review process and lending finality to state convictions).

Thus, under this standard, Cooey's claim would have accrued in 1991, after the United States Supreme Court denied direct review. However, Ohio did not adopt lethal injection until 1993, or make it the exclusive method of execution until 2001, so the accrual date must be adjusted because Cooey obviously could not have discovered the "injury" until one of those two dates. We need not pinpoint the accrual date in this case, however, because even under the later date, 2001, Cooey's claim exceeds the two-year statute of limitations deadline because his claim was not filed until December 8, 2004.

Cooey asserts, and the district court found, that Cooey did not have actual knowledge of Ohio's protocol until May 2002 when he received responses to his inquiries from the Warden. Actual knowledge, however, is not the appropriate measure; the test is whether he knew or should have known based upon reasonable inquiry, and could have filed suit and obtained relief. Cooey should have known of his cause of action in 2001 after amendments to the law required that he be executed by lethal injection, and the information was publicly available upon request. Yet, even if we accepted (and we would not) May 2002, the date when he received the Warden's response, Cooey's complaint is still untimely.

Cooey also argues that the statute of limitations did not begin to run until the *Nelson* decision made a § 1983 action a possible remedy for Cooey. Prior to that 2004 decision, this Court precluded a death row inmate from filing a § 1983 action challenging his method of execution. *See In re Sapp*, 118 F.3d 460, 464 (6th Cir. 1997); *In re Williams*, 359 F.3d 811 (6th Cir. 2004). Indeed, in *Williams*, the plaintiff attempted to bring a § 1983 action raising the same argument now presented by Cooey, and this Court concluded that the claim must be raised in a § 2254 habeas action. Nonetheless, "the plaintiff in *Nelson* was similarly barred by circuit precedent at the time he filed his suit. So long as there remains the possibility of en banc reconsideration and Supreme Court review, circuit law does not completely foreclose all avenues for relief." *Harris v. Johnson*, 376 F.3d 414, 418-19 (5th Cir. 2004). This Circuit's precedent did not prevent Lewis Williams and John Roe from filing their lethal injection § 1983 actions. *See In re Williams,* 359 F.3d 811 (6th Cir. 2004).[7]

---

[6] Direct review of conviction includes review by the United States Supreme Court. *Bell v. Maryland*, 378 U.S. 226, 232 (1964). The one-year statute of limitations for habeas review under AEDPA does not begin to run until the ninety-day time period for direct review in the United States Supreme Court has expired. *Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir. 2000); *Isham v. Randle*, 226 F.3d 691, 694-95 (6th Cir. 2000).

[7] The Sixth Circuit decided in *In re Williams* on January 12, 2004. The petitioner in that case, whose claim is identical to Cooey's, based his request for a stay of execution on the Supreme Court having granted *certiorari* in *Nelson v. Campbell*, 541 U.S. 637 (2003). The majority decided that it would continue to adhere to Sixth Circuit precedent, namely *In re Sapp*, 118 F.3d 460, 464 (6th Cir. 1997). At the same time, while the majority affirmed the district court's decision construing the § 1983 action as a successive habeas corpus action and transferring it to this Court for authorization, it was by a slim margin. *See Williams*, 359 F.3d at 814-17 (one judge concurring on different grounds, one judge dissenting, and a close split among the judges in denying the petition for en banc review).

Lastly, Cooey argues, and the district court found, that the fluid nature of Ohio's execution protocol requires imminency of execution to be a key factor in the accrual calculus, citing *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-45 (1998). We recently rejected a similar argument in *Alley*. In *Alley*, a Tennessee inmate also argued that his § 1983 claim challenging Tennessee's lethal injection protocol was not ripe until an execution date was imminent. In rejecting this argument we stated:

> Alley's brief cites *Stewart v. Martinez-Villareal*, 523 U.S. 637 . . . (1998) as prohibiting courts from considering challenges such as the one in our case before a petitioner's execution reaches imminence. We reject this reading of this precedent. In that case, unlike in ours, the defendant's claim under *Ford v. Wainwright*, 477 U.S. 399 . . . (1986), had originally been dismissed without prejudice. The Supreme Court's ruling merely allowed the claim to proceed in a habeas petition at a later date. The Court noted that the lower courts had specifically left open the possibility that the defendant's *Ford* claim could proceed in a future filing. *Id.* at 640 . . . . No such procedural history informs the posture of the § 1983 claim in our case. Moreover, we note that claims involving mental competency are inherently different from the § 1983 petition before us in at least one respect: mental competency is subject to variance over time. It is indeed possible that last-minute first-instance *Ford* petitions could be justified by a change in a defendant's mental health.

*Id.* at 607.

In contrast, while the lethal injection protocol in this case is subject to change, there was no evidence, until recently, that the protocol had ever been changed. And, furthermore, the recent changes do not relate to Cooey's core complaints.

During the pendency of this appeal, indeed while the matter was stayed, Cooey moved to expand supplemental briefing or to remand to the district court to further address Ohio's recent changes in its execution protocol, which he claimed is consistent with his claim that the malleable nature of Ohio's lethal injection protocol means that a § 1983 action cannot be imminent until close to the date of execution. In support, Cooey attached a memo written by Ohio Department of Rehabilitation and Correction Director Terry Collins, dated June 27, 2006. In that memo Collins adopted five "recommendations and process changes" regarding Ohio's execution protocol.

Ohio's recent amendments to its lethal injection protocol resulted from difficulties encountered during the execution of Joseph Clark on May 2, 2006. When preparing Clark for execution, prison officials could find only one accessible vein in Clark's arms to establish a heparin lock, through which the lethal drugs are administered. (Two locks usually are inserted.) However, once the execution began and the drugs were being administered, this vein collapsed, and Clark repeatedly advised officials that the process was not working. Officials stopped the lethal injection procedure, and after a significant period of time, were able to establish a new intravenous site. The process then was restarted, and Clark was executed.

To avoid similar difficulties in future executions, Ohio made several changes to its lethal injection protocol. First, officials removed time deadlines that previously dictated executions begin by a certain hour, and be completed within a narrow time frame. Second, prisoners are given more in-depth medical examinations prior to execution. Third, correctional personnel will make every effort to obtain two sites for heparin locks before proceeding to the execution chamber. Fourth, personnel will no longer use "high pressure" saline injections to check the viability of the intravenous lines. Instead, a "low pressure" drip of saline will be used to keep the line open and confirm its ongoing viability. Fifth, correctional personnel will observe each inmate's arms and check for signs of intravenous incontinence while the drugs are being administered to the inmate.

As Defendants assert, none of these changes relates to Cooey's core complaints. Further, none of these areas were implicated as a basis for Cooey's expert's conclusion that the process presents a risk that Cooey will experience pain. Rather, Dr. Heath, Cooey's expert, criticized the use of pancuronium bromide, the use and dosage of sodium thiopental, the failure to provide a continuous dose of an ultra-short-acting barbiturate, and the lack of information regarding prison personnel's training to prepare and administer the drugs. Cooey cannot prevail on this basis either.

In sum, we hold that the district court erred in ruling that the statute of limitations had not run on Cooey's method-of-execution claim because it used an improper test for establishing the accrual date for § 1983 method-of-injection challenges.

## C. Res Judicata

Because we conclude that Cooey's claim fails on limitations grounds, we need not address the State's *res judicata* argument.

## III. Conclusion

For the foregoing reasons, we **REMAND** this matter to the district court with instructions to **DISMISS** Cooey's § 1983 complaint with prejudice as barred by the statute of limitations.

———————————

**DISSENT**

———————————

RONALD LEE GILMAN, Circuit Judge, dissenting. The majority sets forth two rationales for its conclusion that the two-year statute of limitations on Cooey's 42 U.S.C. § 1983 claim accrued at the end of the direct review of his conviction and sentence by the Ohio Supreme Court. First, the majority expresses concern that the district court's accrual date—at the point when the inmate's execution is imminent and all state and federal remedies, including postconviction proceedings, have been exhausted,—"subverts the purpose of statutes of limitations, which are designed to promote judicial economy and protect defendants' rights." (Maj. Op. at 6) (citation and quotation marks omitted). The majority's other rationale is that the district court's accrual date "adds a significant period of delay to a state's ability to exercise its sovereign power and to finalize its judgments, which disrupts the vital yet delicate balance between state and federal relations." (Maj. Op. at 7). In essence, however, I believe that these two reasons boil down to the single assertion that the habeas process "takes too long." I find this rationale disturbing for the following reasons:

**A.      Justice and judicial efficiency**

Timeliness is important, but justice is more important. Although the common saying is that "justice delayed is justice denied," there are situations in which the adage does not hold true. I believe that this is one of those situations. Judges in criminal cases are allowed to apply the "ends of justice" exclusion to permit certain delays in a criminal prosecution, notwithstanding the defendant's right to a speedy trial. 18 U.S.C. § 3161(h)(8)(A); *see also United States v. Monger*, 879 F.2d 218, 221-22 (6th Cir. 1989) (finding that the magistrate judge properly granted an "ends of justice" continuance in a complex criminal trial involving a large quantity of wiretap evidence and multiple coconspirators). I believe that the "ends of justice" principle is equally applicable to Cooey's § 1983 challenge.

Cooey and the intervenors in his complaint allege that the lethal-injection protocol used in Ohio will violate their Eighth Amendment right to be free of cruel and unusual punishment. Specifically, they contend that the ultra-short acting anesthetic, thiopental sodium, may fail to induce unconsciousness and that, as a result, they may be conscious when the paralytic agents, pancuronium bromide and potassium chloride, are administered. They assert that if that happens, they will likely suffer excruciating pain from the resulting death by suffocation and a chemically induced heart attack, but that, because the pancuronium bromide paralyzes their voluntary muscles, they will be unable to move or speak.

The interests of justice are great where, as here, the § 1983 claimants challenge only the method by which their death sentences are carried out, not the validity of their sentences. Ensuring that executions comply with the Constitution of the United States is a paramount duty for the courts, despite the human and financial costs of protracted postconviction litigation. "[W]hile justice delayed may be justice denied, prompt *injustice* is not the answer." *Haitian Refugee Ctr. v. Smith*, 676 F.2d 1023, 1040 n.43 (5th Cir. 1982) (emphasis added).

The majority looks to AEDPA in its analysis of the statute-of-limitations question. I think this blurs the distinction between federal habeas proceedings and § 1983 actions, and misapprehends the distinction between the two causes of action. AEDPA imposes a one-year statute of limitations for filing a federal habeas petition. 28 U.S.C. § 2244(d)(1)(A). This one-year period promotes finality in state-court judgments. *Duncan v. Walker*, 533 U.S. 167, 179 (2001) ("This provision reduces the potential for delay on the road to finality by restricting the time that a prospective federal habeas petitioner has in which to seek federal habeas review."). But a § 1983 action is not an attack

on the validity of the death-sentenced inmate's conviction or sentence. Cooey concedes in his complaint that he "does not seek injunctive relief . . . as a means of attacking his underlying conviction or death sentence." His sentence became final on March 31, 2003, when the Supreme Court declined to review this court's denial of Cooey's federal habeas petition. *Cooey v. Coyle*, 538 U.S. 947 (2003). Instead, he raises a claim that the state's *method* for executing the death sentence will violate his constitutional rights.

The majority faults Cooey for failing to bring his method-of-execution challenge earlier, such as in 1993, when Ohio made lethal injection one of the methods of execution used in the state, or in 2001, when Ohio made lethal injection the sole method of execution. But prior to the Supreme Court's decision in *Nelson v. Campbell*, 541 U.S. 637 (2004), method-of-execution challenges under § 1983 were barred in this circuit. *See In re Sapp*, 118 F.3d 460 (6th Cir.) (holding that a method-of-execution challenge sounded in habeas, not as a civil rights action), *cert. denied sub nom.*, *McQueen v. Sapp*, 521 U.S. 1130 (1997). In fact, this court reiterated that position shortly before the Supreme Court decided *Nelson*. *See In re Williams*, 359 F.3d 811 (6th Cir. 2004) (concluding that a § 1983 method-of-execution challenge should be construed as an motion for leave to file a successive habeas petition, which was denied).

Despite the above caselaw, the majority in the present case asserts that "[t]his Circuit's precedent did not prevent Lewis Williams and John Roe from filing their lethal injection § 1983 actions." Maj. Op. at 9. I agree with the district court's response to this line of argument: "[The majority] is correct that Williams and Roe tried [to bring a § 1983 claim. The majority] neglect[s] to point out, however, that Williams and Roe failed. Their § 1983 action, consistent with *In re Sapp*, was construed as an unauthorized successive habeas petition and was never fully heard on the merits." Williams and Roe unsuccessfully sought rehearing en banc before this court and their request for review by the United States Supreme Court was denied. *Williams v. Taft*, 540 U.S. 1206 (2004).

In the present case, the district court declined the State's invitation to hold that Cooey was *required* to bring his § 1983 method-of-execution challenge prior to *Nelson*. I agree. Even if Cooey could have brought his civil rights complaint before 2004, which I find dubious, I see no justification for holding that he was required to do so.

I am of the opinion that the district court's analysis of Cooey's complaint and of the State's motion to dismiss is thorough, compelling, and frankly more persuasive than the majority's analysis. After carefully considering the evidence before it, the district court articulated a reasoned basis for setting the accrual point for statute-of-limitations purposes at the time when a prisoner's execution becomes imminent and the prisoner knows or has reason to know of the facts giving rise to his § 1983 claim. The district court fixed the point at which an execution becomes imminent as the time "when all other legal challenges to the validity of a death sentence come to an end, *i.e.*, when the plaintiff has exhausted all of his state and federal avenues of relief."

A death-sentenced inmate knows or has reason to know of the facts of his method-of-execution challenge when he learns the details of the protocol that will be used for his execution. *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996) ("Under federal law as developed in this Circuit, the statute of limitations period begins to run when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred."). This latter consideration poses a greater difficulty for ensuring judicial efficiency and stability in Ohio because the lethal-injection protocol is a creature of the Ohio Department of Rehabilitation and Correction (ODRC) and is not established by statute or administrative rule or regulation. The ODRC can change the protocol at any time, regardless of whether an inmate is scheduled for execution.

This concerns me because, as has been evidenced in the aftermath of the Joseph Clark execution, Ohio is free to periodically change its lethal-injection protocol. *See* Reginald Fields, *Ohio revamps lethal-injection procedure*, Cleveland Plain Dealer, June 29, 2006, at B1 (describing the extended effort to execute Joseph Clark after prison officials were unable to find a vein in one arm, the vein in the other arm collapsed shortly after the execution began, and Clark informed correctional staff that "this isn't working"). No statutory framework determines when or how such changes may occur. Nor is there a framework governing when, or even if, such changes will be publicized.

The majority asserts that the protocol changes resulting from the Clark execution do not relate to Cooey's "core complaints" and were not implicated as a basis for his assertion that he may experience pain. Ohio law, however, does not require the ODRC to publish any changes to the lethal-injection protocol. The ODRC deems some information about the protocol to be public information and on that basis will provide it to the public upon request. But the ODRC considers other information nonpublic.

Moreover, I am not convinced that Ohio's 2006 protocol changes were merely "refinements" to the procedure as the state describes them. The switch from high-pressure saline injections to a low-pressure saline drip to flush the IV tubing and maintain its "viability" raises concerns about adequately flushing the tubing between injections so that the drugs do not react with one another before they reach the inmate's arm. I see nothing in the protocol or its amendments that addresses the risk of such an occurrence, or what steps would be taken to prevent or remedy it. As we have learned from reading the sometimes voluminous literature that accompanies even the simplest prescription, drug interactions can dramatically alter the efficacy or safety of pharmaceuticals. Without any further evidence in the record regarding how the changes affect the risk of violating a death-sentenced inmate's constitutional rights, I am unwilling to agree with the majority that the recent protocol changes do not relate to Cooey's core complaint.

## B.     When Cooey had reason to know of the grounds for his claim

The majority also contends that Cooey was aware of the lethal-injection drug combination and the equipment that would be used as of at least 2002. This assertion rests on the inclusion with Cooey's complaint of a letter dated April 19, 2002 from James S. Haviland, then the Warden of the Southern Ohio Correctional Facility, where Ohio's only death chamber is located, disclosing information about the lethal-injection protocol. Haviland's letter, however, is addressed to no one and carries no address information for any recipient. From my reading of the letter, I cannot ascertain to whom it was addressed or when Cooey might have learned of its contents.

In the April 19, 2002 letter, Warden Haviland provided the names of the intravenous equipment used in executions and the generic names of the pharmaceuticals used to execute the inmate. He did not disclose the amounts of the drugs to be used, or any information about the form in which they were purchased, stored, or administered. Further, he did not state whether the drugs were administered individually or all at once, and, if individually, in what sequence. There was also no information provided about the length of the IV tubing used, whether any death-chamber personnel monitored the tubing for kinks or blockages, or whether the tubing was flushed between the drugs.

In a letter dated May 30, 2002, Vincent Lagana, ODRC Staff Counsel, responded to an unidentified recipient's request for additional information about the lethal-injection protocol by noting that "information about [lethal-injection] training, procedures, and procurement . . . . falls outside the scope" of the Ohio Public Record Law. Nonetheless, Lagana provided some information about the procedure because "the Department recognizes [that] the public has legitimate interests in this subject." This information revealed that the three drugs in the lethal-injection protocol were

administered in "normal saline concentration," that the thiopental sodium and pancuronium bromide were purchased from "a local pharmacy" by the correctional institution pharmacy, and that the drugs were kept by the Warden in accordance with procedures developed by the Ohio State Board of Pharmacy and the Drug Enforcement Agency.

I note, however, that the letter also includes potentially misleading information. For example, it states that "[a] Medical Doctor has pronounced death." Although this might be true to the extent that a medical doctor pronounced the death of an inmate at some point after the execution was completed, it fails to acknowledge that several associations of medical professionals, including the American Medical Association (AMA) and the Society of Correctional Physicians (SCP), direct their members not to be involved in a legally authorized execution. The AMA permits physicians to "certify[] death, provided that the condemned has been declared dead by another person." Am. Med. Ass'n, Code of Ethics E-2.06 (2000). Under the SCP Code of Ethics, "[t]he correctional health professional shall not be involved in any aspect of execution of the death penalty." Soc'y of Corr. Physicians, Code of Ethics (1998), http://www.corrdocs.org/ethics.html (last visited Feb. 16, 2007).

I take the facts in the light most favorable to Cooey, as I must when reviewing a denial of a motion to dismiss under the de novo standard. *See Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995). After reviewing the letters from ODRC officials, which purport to set out the lethal-injection policy that was in place in 2002, I am unable to conclude that Cooey had reason to know of the facts underlying his claim prior to that time. The ODRC's response to requests for information has been grudging and incomplete, and it apparently has unfettered discretion in determining whether the requested information is or is not to be made public.

Even having read the letters, I can see how a reasonable person would still be uninformed as to Ohio's death-penalty protocol or how it might support a civil rights action. At best, Cooey's knowledge of the protocol as of May of 2002 would have been murky; it would have been totally opaque at any time prior to that date. The point of all this is that the majority's assertion that Cooey had reason to know of the basis for his complaint in the 1990s is not supported by the record. And although I recognize that May of 2002 represents a point more than two years before Cooey in fact filed his § 1983 complaint, this is only one part of the necessary analysis. The other part is to determine when Cooey's execution date became imminent. This did not occur until March 31, 2003, when the Supreme Court denied his petition for certiorari in his habeas proceeding. He filed his present complaint on December 8, 2004, which was 21 months later.

## C.        **When Cooey's execution became imminent**

Almost every death-sentenced inmate challenges his or her conviction and sentence through habeas proceedings. Under the majority's rationale, however, virtually every death-sentenced litigant will be barred from bringing a § 1983 action challenging the constitutionality of the method of execution chosen by the State. Habeas proceedings have become, for good or for ill, a routine part of the process of carrying out a death sentence in our criminal justice system. To require a petitioner to file a § 1983 action three to five years before his or her execution in order to obtain legal review of the lethal-injection protocol strikes me as counterintuitive, unduly harsh, and just plain wrong. Yet that is what the majority's rationale will require.

Moreover, both the petitioners and the courts will have to manage the cognitive dissonance and inefficiency of simultaneously deciding (1) habeas petitions attacking the validity of the conviction and sentence, and (2) § 1983 actions challenging the constitutionality of the procedure used to carry out the sentence. The majority will thus force death-sentenced prisoners to pursue their habeas claims that assert their lack of culpability or, in some instances, their actual innocence, while simultaneously implying their guilt by requesting that the sentence imposed upon them be carried out in a constitutionally compliant manner.

Statutes of limitations are intended to "promote judicial economy and protect defendants' rights." *John Hancock Fin. Servs., Inc. v. Old Kent Bank*, 346 F.3d 727, 734 (6th Cir. 2003). But the concept of judicial economy contemplates more than just the minimization of temporal delay between the imposition of a capital sentence and an inmate's execution. Although the Fifth Circuit has held that a method-of-execution challenge can be raised at any time after an inmate's sentence became final on direct review, *Neville v. Johnson*, 440 F.3d 221, 222 (5th Cir. 2006) (per curiam), this analysis is incomplete. The majority defends its adoption of the *Neville* accrual point as "the most logical," but I consider even more logical the analysis of the district court in the present case that fixes the statute of limitations accrual date at the point when a petitioner's execution becomes imminent and he has reason to know of the facts giving rise to his claim.

This accrual date provides clarity and certainty to both the death-sentenced inmate and the State that the sentence is final and not susceptible to attack, that the execution date is set, and that the protocol for that execution is likely fixed. Such clarity also aids the judicial process and increases the efficiency of judicial proceedings by ensuring that the federal courts are not overseeing simultaneous but contradictory arguments from the parties.

Contrary to the majority, I see nothing in the Supreme Court's February 21, 2007 opinion in *Wallace v. Kato*, 127 S. Ct. 1091 (2007), that bears on the issue of when the statute of limitations should accrue in the case before us. *Wallace* is a civil rights case that turned on the well-recognized point that "[t]he cause of action accrues even though the full extent of the injury is not then known or predictable." *Id.* at 1097. Here, Cooey had no reasonable basis to know if he would have any injury at all (in terms of the lethal-injection protocol) until his execution date became imminent. I therefore conclude that Cooey's § 1983 action is not barred by Ohio's two-year statute of limitations.

## D.      Equitable arguments to forestall delay

Because I believe that the statute of limitations should not begin to run until an execution becomes imminent, and because Ohio will almost always move promptly to set an execution date, I would envision that the statute of limitations would rarely, if ever, be an issue in these § 1983 cases. The crucial issue for federal courts to decide, then, is not the statute of limitations, but whether equitable considerations should bar a prisoner from bringing a last-minute § 1983 claim. This is a concern that Ohio makes much of in the present case. Although there is undoubtedly some merit to this concern, I see no reason to diverge from the Supreme Court's position in *Hill v. McDonough*, 126 S. Ct. 2096 (2006), that "inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits." *Id.* at 2104. This includes applying "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Nelson v. Campbell*, 541 U.S. 637, 650 (2004).

The district court, with its ability to hear and weigh the evidence, necessarily has the greatest information available to it from which to balance the equities when considering a death-sentenced prisoner's request for a stay of execution. As we have seen in the present case, the district court has capably engaged in that very task, despite the sometimes inconsistent guidance received from this court. *Compare Cooey (Lundgren) v. Taft*, No. 06-4374 (6th Cir. Oct. 23, 2006) (summarily vacating the stay of execution for Jeffrey Lundgren, who had an execution date of October 24, 2006), *with Cooey (Henderson) v. Taft*, No. 06-4527 (6th Cir. Dec. 1, 2006) (reversing the district court's denial of Jerome Henderson's motion to stay his execution).

The district court also considered and addressed the concern that death-sentenced inmates might seek to use § 1983 actions as a delaying tactic, cautioning would-be plaintiffs that "nothing

. . . should be construed as guaranteeing or even suggesting that a plaintiff who waits too long to file his § 1983 action raising a method-of-execution claim will be entitled to a preliminary injunction." This concern about excessive delay was underscored by the Supreme Court's decision in *Hill*, which stated that equity requires that inmates seeking a stay of execution to raise a § 1983 claim must meet all the requirements for a stay. 126 S. Ct. at 2104. "[E]quity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id.*

Factors that may play a persuasive or even dispositive role in a court's determination of whether to grant a stay of execution might include such considerations as (1) whether the protocol has recently been changed, (2) whether the petitioner has been diligent in pursuing his or her claim, (3) whether the petitioner has taken reasonable steps to ascertain what the protocol is (and I note that past ODRC letters in response to requests for information about the protocol have been shown to be incomplete and terse to the point of being uninformative), and (4) whether the traditional factors involved in the balancing test for granting a preliminary injunction weigh in favor of a stay. A conclusory statement by a petitioner with no factual support or development is unlikely to result in the entry of a stay in this or any other matter. Petitioners who have been diligently pursuing their method-of-execution claims, in contrast, will likely include affidavits from a medical expert in support of their arguments. If reasonable jurists could debate whether a well-documented claim could result in the relief that the petitioner seeks, then equitable considerations, barring other persuasive evidence to the contrary, would weigh in favor of granting a stay.

I again wish to emphasize that the relief sought here is not to be spared the death penalty, but rather to be spared from cruel and unusual punishment in the administration thereof. Because I am convinced that Cooey brought his § 1983 claim within the two-year statute of limitations period as properly defined, I respectfully dissent.