*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0329p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

GREGORY LEE WILSON,

      *Plaintiff-Appellant,*

    *v.*

JOHN D. REES,

      *Defendant,*

THOMAS SIMPSON, in his official capacity as
Warden, Kentucky State Penitentiary; SCOTT
HAAS, in his official capacity as Medical
Director for the Kentucky Department of
Corrections; STEVE BESHEAR, in his official
capacity as Governor of the Commonwealth
of Kentucky; LADONNA H. THOMPSON, in her
official capacity as Commissioner, Kentucky
Department of Corrections,

      *Defendants-Appellees.*

No. 09-6306

Filed: October 14, 2010

Before: BATCHELDER, Chief Judge; MARTIN, BOGGS, MOORE, COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE, and WHITE, Circuit Judges.

_____

## AMENDED ORDER

_____

This matter came before the court upon the petition for rehearing *en banc* of the September 3, 2010 judgment of the three-judge panel and the response of the appellees thereto. A poll having been taken of the active judges of the court on the question of whether to grant the petition for rehearing *en banc,* and less than a majority of the judges having favored doing so, the request for rehearing has been referred to the original panel. Upon consideration of the petition and response the panel denies the petition.

IT IS SO ORDERED.

BOYCE F. MARTIN, JR., Circuit Judge, dissenting from denial of rehearing en banc.  I continue to disagree with the claim-accrual analysis for method-of-execution claims announced in *Cooey v. Strickland* (*Cooey II*), 479 F.3d 412 (6th Cir. 2007), and therefore I dissent from the denial of rehearing en banc.  *See, e.g., Cooey v. Strickland*, 489 F.3d 775, 776-78 (6th Cir. 2007) (Gilman, J., dissenting from the denial of rehearing en banc).  In addition, I write to highlight this particularly ugly example of why "the death penalty in this country is arbitrary, biased, and so fundamentally flawed at its very core that it is beyond repair." *Moore v. Parker*, 425 F.3d 250, 268 (6th Cir. 2005) (Martin, J., dissenting).

The rape and murder of Debbie Pooley was a heartbreaking and reprehensible act.  But at Gregory Wilson's murder trial, the state's ignominy began.  Of all the people involved in this case, only two have behaved in a manner worthy of the ideals of our justice system: the courageous Franklin Circuit Court judge who stayed Wilson's execution; and Andrew Wolfson, the diligent Courier-Journal reporter who exposed the glaring deficiencies in Wilson's trial.  I quote extensively from Mr. Wolfson's article because he appears to have worked more conscientiously than many of the participants in this case, and he highlights how virtually every branch of our justice system failed — from the judiciary, which allowed a sex scandal between a colleague of the trial judge and Wilson's co-defendant to jeopardize the fairness of Wilson's trial; to the defense counsel, who were woefully unqualified and left Wilson abandoned at trial.

The judiciary failed both Wilson and our legal system in this case because a judge's unseemly conduct created a risk of bias that undermined the fairness of Wilson's trial.  Brenda Humphrey, Wilson's co-defendant and the woman who identified him as Pooley's killer, was having an illicit sexual affair with Judge James Gilliece, a colleague and good friend of the trial judge during Wilson's trial:

> Years later, it would be revealed in court papers that Wilson's co-defendant, Brenda Humphrey, who testified against him, was taken each day of the trial to the chambers of Lape's colleague, Circuit Judge James Gilliece, where they had sex.
> His trysts with the former prostitute began three years earlier and continued until his death in 1993.  Gilliece wrote Humphrey 280 sexually

explicit letters in which he called her his "doll baby" and assured her — erroneously, it turned out — that "you are sure to be free very soon."

Andrew Wolfson, *Kentucky Death-Row Inmate's Trial Littered with Problems*, Courier-Journal, Sept. 8, 2010, at A1.

This shocking impropriety not only degraded our judicial system, but also created a real risk of unfairness at Wilson's trial:

> [In] 2001 . . . Humphrey filed a motion seeking a new trial, revealing her relationship with Gilliece. She argued that he forced himself on her and that kept her from getting effective representation.
>
> Humphrey testified that after being charged with prostitution in 1985, she began seeing Gilliece about once a week in his chambers for sex, even after she was charged in Pooley's kidnapping and murder.
>
> Records showed that Gilliece put $3,000 in her jail account, bought her a new dress for trial and wrote her florid love letters.
>
> Kenton Circuit Judge Steven Jaeger eventually rejected Humphrey's motion, saying she was a "willing participant" and "mistress of her own fate."
>
> Jaeger, however, wouldn't let Wilson participate in the hearing he granted Humphrey, and [Wilson's attorney] Goyette says that denied Wilson the chance to prove that the relationship between Gilliece and Humphrey may have affected how Lape conducted the trial.
>
> If Wilson had known of the relationship at the time of the trial, Goyette said, he could have used it to undermine Humphrey's credibility when she testified against him.

*Id.*

This scandal is an embarrassment to all segments of the judiciary, from the judge who violated the Code of Judicial Conduct by having a sexual relationship with a defendant to the court officers who broke their oath of office by ferrying this defendant to and from the judge's chambers for sex. When any trial is infiltrated by this sort of sordid corruption, it demeans our judicial system and undermines public confidence in its judgments. When a criminal defendant's life is at stake, it is horrifying.

Perhaps even more egregiously than the judiciary, Wilson's defense counsel failed him and the principles of our legal system. From the very beginning of the case, Wilson's defense was clearly a charade:

The judge posted his plea on the courtroom door: "PLEASE HELP. DESPERATE. THIS CASE CANNOT BE CONTINUED AGAIN."

After more than a year of begging for lawyers to defend Gregory Wilson's capital-murder case for the maximum state fee of $2,500, Chief Kenton Circuit Judge Raymond Lape Jr. finally found two takers in May 1988.

But one of them, John Foote of Florence, had never tried a felony, let alone a murder case. And the other was William Hagedorn of Newport, a "semi-retired" lawyer who volunteered to serve as lead counsel for free, though he had no office, no staff, no copy machine and no law books.

Hagedorn practiced out of his home, where he displayed a flashing "Budweiser" sign. His business card gave the phone number of "Kelly's Keg," a local bar. And as Foote would later say in an affidavit, Hagedorn "manifested all the signs of a burned-out alcoholic."

. . . .

As Goyette later summarized it in court papers, Hagedorn "was a troubled lawyer with drinking problems, bar association disciplinary problems and legal problems of the criminal variety," investigated on allegations of hiding stolen property under his office floor.

"Even if he was not drinking . . . he would ramble and digress," Foote said. "He seemed incapable of having a meaningful discussion about the case."

*Id.*

Unsurprisingly, these two wholly unqualified attorneys did a deplorable job representing Wilson:

According to briefs later filed on Wilson's behalf, Hagedorn visited his client once in jail before trial. He failed to investigate evidence collected by police, including a knife-like letter opener owned by Humphrey, to see if it was stained with blood.

Hagedorn also failed to interview a jailhouse informant who claimed Wilson had confessed. And he neglected to interview or subpoena Humphrey's sister, who had told police that Brenda Humphrey had admitted cutting the victim's throat.

Perhaps most egregiously, Goyette said, Hagedorn failed to prepare early for the penalty phase of the trial, so that family members who later said they would have testified on behalf of sparing Wilson's life were never contacted.

*Id.*

Multiple sources have noted the appalling quality of representation that Wilson's defense counsel provided:

> In an interview, Goyette said Wilson's trial was a "complete farce and a mockery." In a brief, one of Wilson's previous lawyers likened the appointment of Hagedorn, who died in 1991, to "drafting a chiropractor to do brain surgery."
>
> And Stephen Bright, president and senior counsel for the Southern Center for Human Rights, who has written about the case, said in an e-mail that it is a "travesty of justice" and among the worst examples he's ever seen of a defendant tried for his life with unqualified counsel.

*Id.*

Wilson found himself in the impossible position of having no competent counsel and sorely lacking any skills and resources to defend himself:

> For the first two days of jury selection, Wilson allowed Hagedorn and Foote to represent him.
>
> But he continually complained they weren't competent.
>
> Lape, the trial judge, ordered the lawyers to assist Wilson during the trial, but they came and went, according to witnesses, one of whom estimated that Hagedorn was present less than half the time.
>
> Wilson delivered his own opening statement. According to a transcript, it read, in its entirety: "I am not a lawyer, and I'm not guilty."
>
> For the first two days of trial, Wilson questioned none of the prosecution witnesses.
>
> "I don't know how to question," he said.
>
> He didn't challenge Humphrey's testimony that he strangled Pooley, and he didn't call as a witness her sister, Lisa Mains, who had told police that "Brenda said she was the one that cut her throat."
>
> Neither Wilson nor Hagedorn cross-examined the two other key prosecution witnesses, Finkenstead and Willis Maloney, the jailhouse witness, and the jury never learned that Maloney once dated Humphrey and allegedly beat her for dating Wilson.
>
> Wilson allowed Hagedorn to cross-examine several expert witnesses, and he did so effectively, the Kentucky Supreme Court would later find.
>
> He got one expert to admit he couldn't establish the cause of Pooley's death and found no evidence she'd been raped, and one of the Holiday Inn maids to concede she couldn't remember anything about the man she said was with Humphrey other than that he was black.

But trial records show Hagedorn was missing from the courtroom during the direct examination of the forensic pathologist, and later had to ask the judge to summarize that witness's testimony before his cross-examination.

Wilson gave a closing argument that took 1½ pages to transcribe; the prosecutor's took 54.

*Id.*

Thus, the defense in this case began with a handwritten note begging for volunteers, and ended with Wilson clumsily attempting to defend himself because he lacked competent counsel. I cannot reflect on this case without recalling the landmark decision *Gideon v. Wainwright* and its admonition:

From the very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him.

372 U.S. 335, 344 (1963). Nearly half a century after *Gideon*, its promise remains unfulfilled. Capital defendants like Wilson are routinely appointed counsel without the experience, skill, or commitment to adequately represent them. Much of the arbitrary and discriminatory nature of our current death penalty stems from the fact that quality of representation is the single greatest factor in determining when it is applied. The proficiency of a capital defendant's attorney should not mean the difference between life and death. I hope that if any good comes from this egregious case, it might serve as a clarion call for a recommitment to achieving *Gideon*'s guarantee of competent counsel for all defendants.

Over my more than thirty years on the bench, Wilson's trial stands out as one of the worst examples that I have seen of the unfairness and abysmal lawyering that pervade capital trials. Although I will continue to apply the law of the Supreme Court as required by my oath, I must reiterate my belief that "the idea that the death penalty is fairly and rationally imposed in this country is a farce." *Moore v. Parker*, 425 F.3d

250, 270 (6th Cir. 2005) (Martin, J., dissenting). To maintain the legitimacy of our adversarial system of justice, we must be confident that its two foundational components are sound: a neutral and fair arbiter, and adequate legal representation for both parties. If either pillar is fractured, as in this case, then we are left with a system that does not function. Its results cannot be trusted, particularly when a life is at stake. When a person is sentenced to death in a kangaroo court such as Wilson's, with an illicit sexual affair taking place between a co-defendant and a colleague of the trial judge and no semblance of qualified defense counsel, it irreparably tarnishes our legal system. Until we reform this broken system, we cannot rely on it to determine life and death.

ENTERED BY ORDER OF THE COURT

/s/ Leonard Green
_____
Clerk