*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0290p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JASON GETSY,

        *Plaintiff-Appellant,*

     *v.*

   No. 08-4199

TED STRICKLAND, et al.,

        *Defendants-Appellees.*

Filed: August 17, 2009

_____

**ORDER**

_____

A member of the court having suggested *rehearing en banc,* 6 Cir. I.O.P. 35(c), the matter was referred to all[*] active judges, less than a majority of whom voted in favor of such rehearing. Accordingly, the decision of the panel remains in place, the motion of the appellant to stay execution is denied, and the Clerk is directed to issue the mandate forthwith.

It is so ORDERED.

_____

[*]Judge Cook recused herself from participation in this matter.

1

KAREN NELSON MOORE, Circuit Judge, with whom MARTIN, COLE, and WHITE, Circuit Judges, join, dissenting from denial of rehearing en banc. I dissent from the denial of rehearing en banc for the reasons expressed in my concurring opinion in *Getsy v. Strickland*, No. 08-4199, slip op. at 8 (6th Cir. Aug. 13, 2009) and for the reasons articulated in Judge Gilman's dissents in *Cooey v. Strickland*, 479 F.3d 412, 424 (6th Cir. 2007) (*Cooey II*), and *Cooey v. Strickland*, 489 F.3d 775, 776 (6th Cir. 2007).

As I have previously emphasized, "'[a] suggestion for rehearing en banc is an *extraordinary procedure* which is intended to bring to the attention of the entire Court a precedent-setting error of *exceptional public importance* or an opinion which *directly conflicts* with prior Supreme Court or Sixth Circuit precedent.'" *Bell v. Bell*, 512 F.3d 223, 250 (6th Cir. 2008) (Moore, J., dissenting) (quoting 6 Cir. R. 35(c) (emphasis added)). This is precisely that case.

Determining when the statute of limitations begins to run for a death-sentenced prisoner who wishes to challenge a state's method of execution under 42 U.S.C. § 1983 is tantamount to determining whether the prisoner will be able to challenge the method of execution at all. Certainly, the determination of when a person becomes time barred from challenging a procedure that may violate his or her constitutional rights is of "exceptional public importance." Because the panel majority in *Cooey II* fundamentally erred in determining the moment at which the statute of limitations begins to run in a § 1983 method-of-execution challenge—and we are thus improperly constrained in *Getsy*—en banc review is required.

Furthermore, as stated in my concurring opinion in *Getsy*, applying *Cooey II*'s "precedent-setting error" in Getsy's case is unconscionable. Due to the majority's refusal to review *Cooey II* by way of its application in *Getsy*, Getsy will be executed on August 18, 2009, without ever having the opportunity to have a court consider the merits of his Eighth Amendment challenge to his method of execution, a method that a court may well find unconstitutional just a few short months following his death by lethal injection. For the foregoing reasons, I dissent from the denial of en banc review.

MERRITT, Circuit Judge, with whom MARTIN, Circuit Judge, joins, dissenting. I dissent from the failure to grant Jason Getsy a stay of execution until the case can be fully heard by the court in a deliberative and careful way, or, failing that, until the Supreme Court of the United States has an opportunity to consider the case. The decision not to stay Getsy's imminent execution adds one final, absurd injustice to this court's complete mishandling of his case.

1. Last week, a divided panel of this court concluded that *Cooey v. Strickland*, 479 F.3d 412 (6th Cir. 2007) ("*Cooey II*") required us to find that Getsy's challenge to Ohio's 2009 alterations to its lethal-injection protocol somehow became time barred in 2003, six years before the alterations took place and five years before the new Supreme Court decision setting out a new Eighth Amendment standard in such cases. As I explained in dissent, this holding unnecessarily and unconscionably expanded *Cooey II*, turning it into an insuperable bar to any § 1983 challenge to the state's lethal injection protocol. *See Getsy v. Strickland*, No. 08-4199 (6th Cir. Aug. 13, 2009) (Merritt, J., dissenting) (attached as Exhibit "A"). The court's deceptive attempt to say that some unknown, undescribed future case might not be time barred, if the challenged alterations are sufficiently egregious, improperly conflates the merits of the case with the statute of limitations, and is not even consistent with the *Cooey II* case or any other case in the legal canon.

Given this situation, it is incomprehensible to me that we would refuse to stay Getsy's execution until the decision is final. It should be noted that all three members of the panel agreed that if *Cooey II* in fact required us to dismiss Getsy's case as time barred, that rule would be utterly illogical and would require immediate revisitation, either by the *en banc* court or the Supreme Court. Staying Getsy's execution for the few extra days that those two courts would require to act is the least we can do. This is particularly true when the recency of the panel decision, combined with a *sua sponte* call for *en banc* review, have made it difficult for Getsy's lawyers to seek Supreme Court review. If, after reasoned deliberation, both courts decide to leave this holding

undisturbed, then the execution could go forward.  Refusing to wait until such reasoned deliberation takes place is not just procedurally inappropriate, but patently unjust.

2.  The Supreme Court of Ohio has said that Getsy's death sentence was grossly disproportionate to the lesser sentence imposed on the most culpable of the conspirators — the man who conceived, planned, paid for and participated in the crime.  I have previously pointed out this unprecedented injustice in the *en banc* dissent joined by five other judges.  It is attached as Exhibit "B."

3.  The parole board of the State of Ohio has issued a strong, reasoned recommendation that the Governor commute Getsy's sentence to life.  The Governor, facing an impending election, refused after the local District Attorney publicly protested.

**Exhibit "A"**

**No. 08-4199**

***Getsy v. Strickland, et al.***

MERRITT, Circuit Judge, dissenting.  This case is about the meaning and precedential scope of *Cooey v. Strickland*, 479 F.3d 412 (6th Cir. 2007) ("*Cooey II*"). Judge Gilman, the author of the majority opinion in the instant case, dissented from and strongly disapproves of the *Cooey II* decision, a case that expressly allows actions based on a new lethal injection "protocol."  And *Cooey* certainly does not even mention or attempt by any language or logic to foreclose actions when the Supreme Court creates a new cause of action or when new facts arise predicting severe pain in the upcoming lethal injection process.  Whatever defects my colleagues see in *Cooey II*, they are minor — a mere speck in the eye of justice — compared to their opinions that create a mote that cannot be removed without drastic surgery by the *en banc* court.  Rather than create such an intractable mess, it would have been much more reasonable and judicious to write an opinion along the following lines that does not use *Cooey II* to bar actions prematurely that deserve to be considered on the merits.

**I.**

In *Cooey II*, this Court held that when a prisoner brings a § 1983 challenge to a State's lethal-injection protocol, the date on which the statute of limitations begins to run — the so-called "accrual date" — is determined by three considerations:  (1) "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review," *see* 28 U.S.C. § 2244(d)(1)(A), or (2) when lethal injection becomes the exclusive method of execution, whichever is later, unless (3) "the lethal injection protocol . . . changes" in a way that "relates" to the condemned prisoner's "core complaints" about the lethal-injection process. *See Cooey II*, 479 F.3d at 421-23. In *Cooey II*, the Court found that the second element — the date in 2001 when lethal injection became mandatory in Ohio — determined the accrual date, thus placing Cooey's complaint, which was filed in 2004, outside of the two-year statute of

limitations made applicable by federal case law to constitutional claims under § 1983. *See id.* at 424.

But Getsy argues that this reasoning is not the end of the case because two additional significant events distinguish his case from *Cooey II* and revise and extend the accrual date. The first is the Supreme Court's decision in *Baze v. Rees*, 128 S. Ct. 1520 (2008), which recognized for the first time the viability of an objection under the Eighth Amendment to a lethal-injection protocol that creates "a substantial risk of serious harm" or an "objectively intolerable risk of harm" when there is an "alternative procedure" that is "feasible, readily implemented, and in fact significantly reduce[s]" that substantial or objectively intolerable risk. *See id* at 1531-32 (plurality opinion). Getsy argues that this new rule of constitutional law resets the accrual date for such Eighth Amendment challenges. Second, and relatedly, Getsy also argues that he, unlike Cooey, is challenging a recent material alteration to Ohio's lethal-injection protocol and that the accrual date should be determined by reference to the date of that alteration.

## II.

To determine whether these arguments are precluded or approved by *Cooey II*, it is important to understand the nature of the doctrine of binding precedent, which has been a part of our judicial process since at least the time of Henry de Bracton, whose work *The Laws and Customs of England* was published in the thirteenth century. *See* SIR FREDERICK POLLOCK & FREDERIC WILLIAM MAITLAND, THE HISTORY OF ENGLISH LAW 183-84 (Lawyers Literary ed. 1959). This doctrine is especially necessary in the federal court of appeals, a multi-judge court, in which confusion would reign supreme and "the labor of judges would be increased almost to the breaking point if every past decision could be reopened in every case." *See* BENJAMIN CARDOZO, *Lecture IV: Adherence to Precedent*, in THE NATURE OF THE JUDICIAL PROCESS 149 (1920). Like cases must be decided alike, both for this prudential reason and because our judicial goal of fostering equal citizenship and equal status under the law requires it. Yet "in this perpetual flux [of cases], the problem which confronts the judge is . . . [that] he must first extract from the precedents the underlying principle, the *ratio decidendi*" of the case.

*Id.* at 28.  My colleagues in the majority simply fail to try to narrow *Cooey II* to its essential holding.

In *Cooey II*, the Court analogized a § 1983 method-of-execution challenge to a petition for habeas corpus for the purpose of determining the accrual date.  *See Cooey II*, 479 F.3d at 421-22.  That is, the *ratio decidendi* of *Cooey II* is that the requirements set out in 28 U.S.C. § 2244(d)(1) determine the date upon which a § 1983 claim like this one accrues.  That statute provides as follows:

The limitation period shall run from the latest of —

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

. . . .

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).[1]

The Court in *Cooey II* only applied subsection (A) because it was the only one relevant to that particular case.  *Baze* had not yet been decided, and the 2009 amendments had not taken place, so the applicability of subsections (C) and (D) were neither argued nor considered, and it ignores the principle of extracting and applying the *ratio decidendi* of a case to interpret it to require us to ignore the other provisions of § 2244(d)(1).  *Cooey II* does not stand for the rule that my colleagues claim, *i.e.*, that in all lethal-injection cases the statute of limitations expired two years after Ohio adopted lethal injection as the exclusive method of execution in 2001.  It stands rather for the creation of a process that imports from the federal habeas corpus statute the accrual dates set out for the statute of limitations.  Under those rules, when the whole process set out

---

[1]Subsection (B) is not relevant to this case, and therefore is elided.

in *Cooey II* is properly used, Getsy's case is viable and well within the statute of limitations *if it fits within the criteria laid out in subsections (C) or (D).*

## A. Subsection (C)

Subsection (C) has three elements:  the claimant must (1) assert a constitutional right, (2) that has been "newly recognized by the Supreme Court" and (3) "made retroactively applicable to cases on collateral review."  Those elements are present here.  In *Baze*, the plurality made clear that the question before it was one of first impression, and that the Court had "never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment."  *Baze*, 128 S. Ct. at 1530.  The Court had previously upheld every type of execution method, from hanging to shooting to electrocution.  *See id.* at 1526-27, 1530.  But in *Baze* it recognized that execution by lethal injection could violate the Eighth Amendment if it involves a "demonstrated risk of severe pain" that is "substantial when compared to the known and available alternatives."  *Id.* at 1537.

Justices Thomas and Scalia observed that this "formulation of the governing standard" found "no support in the original understanding of the cruel and unusual punishment clause or in any of our previous method-of-execution cases," *id.* at 1556 (Thomas, J., concurring in the judgment), because no case had previously suggested that capital punishment would be unconstitutional if "it involve[d] a risk of pain — whether 'substantial,' 'unnecessary,' or 'untoward' — that could be reduced by adopting alternative procedures," *id.* at 1560.  Justice Thomas went on to observe that the new "formulation" of the standard was more lenient than the Sixth Circuit's previous formulation in *Workman v. Bredesen*, 486 F.3d 896, 907 (6th Cir. 2007), which required an intent to create pain.  The separate opinions of Justice Stevens, Justice Breyer, and Justice Ginsburg (joined by Justice Souter) likewise make clear that the plurality opinion creates a "newly recognized" constitutional right, which in their views arise from the doctrine that, with respect to capital punishment, the Eighth Amendment "'must draw its meaning from the evolving standards of decency that mark the progress of a maturing

society.'" *See id.* at 1568 (Ginsburg, J., dissenting) (quoting *Atkins v. Virginia*, 536 U.S. 304, 311-12 (2002)).

The Court also made clear that the new standard would apply to all condemned prisoners awaiting execution by lethal injection. The plurality discusses at some length how the new formulation should be "implemented" with respect to stays of execution. *See id.* at 1537-38 (plurality opinion). Justice Alito's concurrence fleshes these principles out further. *See id.* at 1538-42 (Alito, J., concurring). It is clear that they contemplate the *Baze* formulation applying to all challenges to lethal-injection protocols, whether those challenges are brought on direct appeal or — far more likely — by prisoners whose direct appeals have become final. Thus, the Supreme Court has now created a "newly recognized" constitutional right "made retroactive to cases on collateral review." Absent a later date made applicable by subsection (D), the accrual date for challenges of this sort would be the date of the Supreme Court opinion in *Baze*, April 16, 2008. We are not called upon to apply the new formulation to the present case on the merits and should leave that in the first instance to the District Court on remand. It is clear, however, that under this new accrual date, Getsy's claim is not barred by the two-year statute of limitations.

## B. Subsection (D)

Getsy also asserts that the May 2009 changes to Ohio's lethal-injection protocol grant the Warden broad discretion to determine the execution procedures used, thereby increasing the risk of unconstitutional execution. The new protocol states:

> o. The Warden shall consider the needs of the condemned inmate, visitors and family members, the execution team, prison staff and other, and may make alterations and adjustments to this or other policies as necessary to ensure that the completion of the execution is carried out in a humane, dignified and professional manner.

May 14, 2009, Execution Protocol Number 01-COM-11, superseding 01-COM-11 dated Oct. 11, 2006. Getsy contends that, under this new discretionary standard, neither avoidable, severe pain nor intentionally inflicted pain is ruled out once the execution is under way, if such

pain would ensure that the execution was completed. We need not decide the merits of this contention, but only whether the argument is time-barred under *Cooey II*.

It may be that Getsy's argument creates an issue "related" to his "core complaints," and thus falls within the exception created by the express language of *Cooey II* itself. But whatever the meaning of *Cooey II* on this point, it is beyond doubt that a challenge to the amended protocol falls within § 2244(d)(1)(D), since the new May 2009 protocol provides a new "factual predicate" that could not "have been discovered through the exercise of due diligence" prior to its passage. To state the problem more clearly, imagine that a defendant is sentenced to death in 1996. In 2001, the State adopts lethal injection as its sole method of execution. In 2009, it decides to cut costs by halving the dosage of each drug that it uses in its three-dug protocol, and further decides that the drugs will be administered by first-year medical students who perform the procedure for free. Imagine further that the several people who are executed under this new protocol suffer a prolonged and excruciating death. If our defendant then seeks to challenge this newly amended protocol, it would seem absurd to read *Cooey II* to require a court to find that the challenge became time-barred in 2003, despite the fact that the challenge specifically attacks changes that were made in 2009. The merits of Getsy's challenge may be weaker than those laid out in this hypothetical. But the statute-of-limitations question is the same. When a prisoner challenges a change in a State's method of execution, that change provides a new "factual predicate" that resets the two-year statute of limitations. As all of the opinions in *Baze* make clear, the constitutionality of a particular method of execution will depend on the specific factual details of its administration. Thus, a change to those details resets the accrual date for a constitutional challenge. *See Walker v. Epps*, 550 F.3d 407, 414-15 (5th Cir. 2008) ("Of course, in the event a state changes its execution protocol after a death-row inmate's conviction has become final, the limitations period will necessarily accrue on the date that protocol becomes effective.").

Getsy's execution, which is currently scheduled for August 18th, should be temporarily stayed pending the District Court's resolution of the merits of Getsy's claim under the standard set out in *Baze*.

**Exhibit "B"**

**No. 03-3200**

*Getsy v. Mitchell*

MERRITT, Circuit Judge, dissenting.  The Ohio state prosecutor, the Ohio Supreme Court, and apparently our Court as well, all concede that the death penalty verdict against Jason Getsy based on a "murder for hire" scheme directly contradicts John Santine's not guilty verdict of the same crime.  The crime is indivisible.  "Murder for hire" is a conspiracy-type crime requiring a criminal agreement and a confederation between two or more people.  Getsy, a teenage boy, was convicted of receiving "murder for hire" money from Santine, and Santine was acquitted of paying the "murder for hire" money to Getsy.  Thus the two verdicts are inconsistent and irrational, and the verdict against Getsy should not be allowed to result in his execution.

The Ohio Supreme Court said clearly that the "predominant" reason for imposing the death penalty on Getsy in this case "is the murder-for-hire specification," 702 N.E.2d 866 at 892, but then observed that the death sentence in the case is "troubling" because John Santine, the only alleged "hirer" and the instigator of the murder, was acquitted of murder for hire:  "If not for John Santine, it is unlikely the Serafinos would have been shot."  *Id.*  In the severed state trial seeking the death penalty against Santine based on the "murder for hire" theory — the trial that led to the Ohio Supreme Court opinion — the state prosecutor repeatedly emphasized to the jury that Santine was by far the most blameworthy defendant.  The prosecutor said then (contrary to his present position) that Santine "could control" Getsy because Santine was "about a decade and a half older" than Getsy, who was 19 years old. (App. 7361)  Getsy was an inexperienced, uneducated boy and "could be easily led, sort of a semi-military lifestyle."  *Id.*  The prosecutor told the jurors that Santine "enticed" Getsy "into his web," "provided marijuana," "talked big," "provided the motive," and "was the only person here with a motive for the killing."  *Id.*  Throughout the case the prosecutor repeated this theory of the case, comparing the relative culpability of the Getsy boy and Santine. Acquitting Santine, the jury rejected the State's theory that Getsy and Santine formed a

criminal agreement of murder for hire — the "predominant" aggravator, as acknowledged by the Ohio courts.

Getsy's irrational, inconsistent death verdict should be set aside based on a clear, long-standing common law principle — a principle adopted by the Supreme Court as a matter of due process long ago, *Morrison v. California*, 291 U.S. 82 (1934), as explained below. As outlined in Section I below, in 1791 and for the two preceding centuries, the English Common Law followed the rule that inconsistent verdicts of guilt based on an alleged criminal agreement or conspiracy must be quashed. In addition, as explained in Section II, literally and textually speaking, the state killing of Getsy in contrast to the treatment of Santine is so grossly disproportionate and unequal as to be both "cruel and unusual" and, therefore, the type of "punishment" expressly forbidden by the Eighth Amendment.

In many cases decided over the last two centuries, the Supreme Court and the lower federal courts have found that English common law rules and principles in existence when the Founders wrote the Constitution serve as valuable tools in defining the meaning of the liberties established in the Bill of Rights, such as those requiring due process of law, forbidding cruel and unusual punishment, establishing the right to a jury trial, guaranteeing cross-examination of witnesses and other civil liberties. We learn of that long tradition of Anglo-American common law adjudication and how it influences our constitutional rights in the first year of law school. *See*, *e.g.*, *Morrison v. California*, 291 U.S. 82 (1934) (adopting under the Due Process Clause the common law rule requiring at least two conspirators to uphold a verdict based on the formation of a criminal agreement, as discussed below); *Deck v. Missouri*, 544 U.S. 622, 631-32 (2005) (holding that Eighth Amendment normally prohibits shackling a capital defendant at trial and sentencing, citing early English common law cases); *id.* at 637-38 (Thomas, J., dissenting) (recognizing the same rule based on Blackstone and Coke's treatises); *United States v. Booker*, 543 U.S. 220 (2005) (following common law requirements for trial by jury in criminal sentencing); *Crawford v. Washington*, 541 U.S. 36, 42-50 (2004) (basing the meaning of Confrontational Clause concerning cross-examination on Blackstone and case law from English courts and American colonies). See the recent scholarly discussion of the

use of English common law in constitutional interpretation, Meyler, *Towards a Common Law Originalism* 59 Stan. L. Rev 551 (Dec. 2006).

## I. The Invalidity of Inconsistent Verdicts in Prosecutions Based on A Criminal Agreement

Since 1599 during the reign of Queen Elizabeth I, when Sir Edward Coke was Attorney General and the young philosopher-scientist, Sir Francis Bacon, was Queen's Counsel, the rule of Anglo-American law has been that "one cannot conspire alone," or alone commit a contract crime like murder for hire. This exact language was first enunciated in *Marsh v. Vaughn*, 78 Eng. Rep. 937 (Q.B. 1599). The opinion of the Queen's Bench states as follows:

> The defendants pleaded not guilty, and the one was found guilty and the other not. And it was hereupon moved, that the bill should abate; for it ought to be against two, <u>and the one cannot conspire alone; and the one being acquitted, the other sole cannot be attainted</u>.

*Id.* (Emphasis added.) This is no judicial aberration. This is the way English law has dealt with such disproportionate punishment. This rule has been consistently followed in English law from that day to this. *See*, *e.g.*, *Harison v. Errington*, 79 Eng. Rep. 1292 (K.B. 1627) (riot); *Rex v. Grimes*, 87 Eng. Rep. 142 (K.B. 1688) (two were charged with "*confederationem*" and "though one was acquitted, yet the jury had found the other guilty" requiring the court to quash the guilty verdict); *Rex v. Kinnersley*, 93 Eng. Rep. 467 (K.B. 1719) (same); *Queen v. Thompson*, 117 Eng. Rep. 1100 (Q.B. 1851) (same); *Rex v. Plummer*, 2 K.B. 339, 345 (1902) (court invalidated a conspiracy conviction after a guilty plea when the defendant's two alleged co-conspirators were acquitted). *See also* IV *Blackstone's Commentaries on the Laws of England*, ch. 10, ¶ 15, p. 136 (1765) (Legal Classics Library 1983) (requiring conviction of two to constitute a criminal agreement "for there must be at least two to form a conspiracy"). This ancient rule of consistency and proportionality in punishment was legislatively enacted by Parliament in 1977, Criminal Law Act, 1977, ch. 45 § 5(8), which provides that when other persons charged with a criminal agreement "have been acquitted of conspiracy by reference to that agreement (whether after being tried with the person convicted or separately) the conviction shall be quashed if under all the circumstances of the case his conviction is inconsistent with the acquittal of the other." For more than four

centuries, from 1599 until the present day, that has been the law. Since the time of Lord Coke, the English courts under this doctrine would never have let Getsy's conviction of murder for hire stand.

In a supreme instance of legal legerdemain, the majority opinion in this case tries to spin the opinion of the Supreme Court in *United States v. Powell*, 469 U.S. 57 (1984), into a rejection of this ancient rule and the rule's insistence on a measure of rationality, consistency and proportionality in punishment. That reliance is completely specious because *Powell* is not a multi-defendant case in which a defendant's conviction of a criminal agreement with another stands as the jury acquits his only alleged co-conspirator. *Powell* was simply a single defendant situation in which the jury convictions on separate counts were inconsistent under one reading of the charges made in the separate counts. There the Supreme Court, relying on language from an earlier opinion by Justice Holmes, held that the separate counts provided rough equity or fairness in holding that the *Powell* defendant must take the bad count with the good counts. *See* 469 U.S. at 62 (quoting and agreeing with Justice Holmes in *Dunn v. United States*, 284 U.S. 390, 393 (1932), in which Holmes relied on an English case from the Queen's Bench, *Latham v. The Queen*, 122 Eng. Rep. 968 (Q.B. 1864), for the proposition that "each Count in an indictment is regarded as if it was a separate indictment").

It is impossible to legitimately rely on *Powell* and *Dunn* here because two terms later in *Morrison v. California*, 291 U.S. 82 (1934), the Supreme Court in a unanimous opinion by Justice Cardozo, followed the ancient English rule that an inconsistent verdict of conviction in a multiple defendant case based on a criminal agreement must be quashed as a matter of due process. In that case the Court found in a state criminal case that the California Supreme Court erred <u>in violation of the Due Process Clause</u> in upholding a conspiracy verdict against one party to an illegal contract for the sale of land when the other party lacked the requisite element of intent and was, therefore, acquitted. Justice Cardozo explained:

> It is impossible in the nature of things for man to conspire with himself.
> *Turinetti v. United States*, 2 F. (2d) 15, 17. In California as elsewhere
> conspiracy imports a corrupt agreement between not less than two with guilty
> knowledge on the part of each. *People v. Richards*, 67 Cal. 412; 7 Pac. 828;
> *People v. Kizer*, 22 Cal. App. 10, 14; 133 Pac. 516, 521; 134 *id*. 346; *People
> v. Entriken*, 106 Cal. App. 29, 32; 288 Pac. 788; *DSands v. Commonwealth*, 21

> Gratt. (Va.) 871, 899; *Pettibone v. United States*, 148 U.S. 197, 203, 205. . . .
> In such circumstances the conviction of Morrison because he failed to assume
> the burden of disproving a conspiracy was a denial of due process that vitiates
> the judgment as to him.   Nor is that the only consequence.   . . . .  <u>The
> conviction failing as to the one defendant must fail as to the other</u>. *Turinetti
> v. United States*, *supra*; *Williams v. United States*, 282 Fed. 481, 484; *Gebardi
> v. United States*, *supra*.

291 U.S. at 92-93 (emphasis added).   Under the Due Process Clause of the Fourteenth
Amendment, the Supreme Court reversed the conspiracy conviction and followed the English
rule in existence when our Constitution was framed.   The Court has never questioned the
validity of its unanimous due process holding in *Morrison*.   It has never retracted or narrowed
the constitutional holding quoted above derived directly from the ancient English rule.   *See*,
*e.g.*,  *Hartzel v. United States*, 322 U.S. 680, 682 n. 3 (1944) (the Court described two other
defendants as "the only co-conspirators of petitioner named in the indictment and the setting
aside of their convictions makes it impossible to sustain petitioner's conviction upon the basis
of count 7 of the conspiracy count").   In *Powell*, relied on in error by the majority, the
Supreme Court does not even mention *Morrison* or the traditional rule — obviously
considering it unrelated to *Powell's* single-defendant, separate count inconsistency, just as the
English courts considered the two rules completely unrelated, as Justice Holmes recognized
in his opinion in *Dunn*.   *Powell* is, therefore, entirely irrelevant to the problem before us and
cannot be legitimately spun as a justification by the majority in favor of upholding Getsy's
execution.

It is equally misguided for the majority to say that a clear, unanimous constitutional
holding in 1934 in *Morrison*, never overruled or questioned since, does not meet the standard
of "clearly established law" found in AEDPA.   If a clear rule of law four centuries old,
adopted as a matter of Due Process 70 years ago by the Supreme Court, will not meet the
AEDPA test, nothing will.

In response to this dissenting opinion, the majority has attempted to distinguish the
*Morrison* case.   It says that *Morrison* does not apply because (a) one of the two alleged co-
conspirators, Santine, was acquitted by a jury rather than by a court, and because (b) the
inconsistent punishment in this case was imposed "by different juries in separate trials" instead

of in a joint trial. The majority would create a brand new "ancient" rule that is incompatible with the original common law rule and with the *Morrison* case. They gut the ancient rule of consistent and proportional punishment adopted in *Morrison* by limiting it to situations where only a judge rather than a jury has acquitted one of the two alleged co-conspirators, and then only after a joint trial. These two exceptions were explicitly rejected by the English common law and by Parliament, as the cases and parliamentary action discussed above clearly demonstrate. The majority refuses to acknowledge that the English common law rule adopted in *Morrison* applies to jury acquittals in separate trials.

Justice Cardozo's unanimous opinion in *Morrison* states the rule it adopts using the same language as the English courts: "It is impossible in the nature of things for a man to conspire with himself . . . . The conviction failing as to one defendant must fail as to the other." 291 U.S. at 93. This language states a general rule and leaves no room for the majority's two exceptions. The *Morrison* rule does not turn on fortuitous circumstances like whether the trial judge granted a severance and tried the defendant separately, or granted a motion for acquittal rather than letting the case go to the jury. In the present case, Getsy and Santine were indicted jointly but severed for trial. The majority makes the question of life or death in this case turn on the granting of a severance. My colleagues in the majority refuse to carry out the basic purpose of the rule: the elimination of inconsistent and disproportionate punishment among alleged co-conspirators.

In addition, and equally important, the effect of the majority's exception for separate trials is to make *Morrison* and the ancient rule completely inapplicable to all modern death penalty cases. The states that continue to use the death penalty bifurcate such trials by conducting a guilt phase trial and then a second trial for imposing the punishment. *E.g.*, Ohio Rev. Code § 2929.03 (describing trial jury's role in determining the sentence for a capital defendant). As a result, trial judges in capital cases now grant a severance and try defendants separately rather than jointly. The bifurcation of all capital trials, together with extensive *voir dire* of jurors and the present requirements for jury findings of individual aggravating circumstances, makes the conduct of multi-defendant capital trials too complex. Therefore, the current practice in capital cases is to grant a severance and try defendants separately, as

in the case of Getsy and Santine. The majority's exceptions mean that the ancient rule of consistency and proportionality of punishment no longer applies in death penalty cases because such trials are not conducted as joint trials.

The ancient rule was adopted and applied when there were almost 200 crimes in addition to murder carrying the death penalty — robbery, larceny, burglary, rape, assault, treason, sedition, blasphemy, sodomy, and many others. The ancient rule was designed to eliminate some of the harshness and arbitrariness of the death penalty by introducing a common sense rule of consistency and proportionality among the participants in the same criminal episode. It is ironic, indeed, that the majority has now eliminated the rule in capital cases. What was true for four centuries in such cases — "it is impossible in the nature of things for a man to conspire with himself" — is no longer true. The majority is willing to destroy the ancient rule, but the judges are unable to cite a single capital case supporting their position from the entire history of Anglo-American law. No such case has ever suggested, much less applied, the majority's exceptions. The *Morrison* rule has existed for four centuries only to be effectively overruled today in capital cases by the majority of this Court.

## II.  Post-*Furman* Death Penalty Jurisprudence Also Outlaws Getsy Death Sentence

Modern post-*Furman* Eighth Amendment proportionality analysis dramatically reinforces the ancient rule's policy against unequal or disproportionate punishments in connection with the same criminal event. The post-*Furman* line of Eighth Amendment death penalty cases based on "evolving standards of decency that mark the progress of a maturing society"[1] emphasize the need to eliminate the kind of grossly disproportionate, arbitrary death sentences found in this case. As I will explain below, the Supreme Court's *Enmund* Eighth Amendment proportionality case reinforces the Supreme Court's adoption of the ancient rule

---

[1]*Trop v. Dulles*, 356 U.S. 86, 100-01 (1958):

> The phrase in our Constitution ["cruel and unusual punishment"] was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. . . . *Weems v. United States*, 217 U.S. 349. The Court recognized in that case that the words of the Amendment are not precise, and that their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

in the *Morrison* due process case. The modern, post-*Furman* mode of death penalty analysis — based on the more humane set of "evolving standards of decency" that now limit the death penalty — reinforces the ancient rule's natural law requirements of rationality and symmetry. Therefore, the more formalist, "originalist" judge and the more pragmatic, "living-constitution" judge should be able to agree on the outcome of this case. But my brothers and sisters in the majority are unable to open their minds to a consideration of either mode of analysis.

In *Furman v. Georgia*, 408 U.S. 238 (1972), the Supreme Court, in a one paragraph per curiam opinion, held that the death penalty was unconstitutionally cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *Id.* at 239-40. The concurring opinions that followed explained that the death penalty was being imposed so discriminatorily, *id.* at 240 (Douglas, J., concurring), and so wantonly and freakishly, *id.* at 306 (Stewart, J., concurring), that any given death sentence was unconstitutionally "cruel and unusual." Indeed, the death sentences examined by the Supreme Court in *Furman* were "cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of [capital crimes], many just as reprehensible as these, the petitioners [in *Furman* were] among a capriciously selected random handful upon whom the sentence of death ha[d] in fact been imposed." *Id.* at 309-10 (Stewart, J., concurring). Thus, *Furman* established that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this penalty to be arbitrarily, capriciously and inconsistently imposed. *Id.* at 310; *Spaziano v. Florida*, 468 U.S. 447, 460 (1984) (*Furman* established that "[i]f a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (*Furman* established that "if a State wishes to authorize capital punishment it has a constitutional responsibility to . . . apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.").

It is now also well settled that the penalty of death is different in kind from any other punishment imposed under our system of justice. "From the point of view of the defendant,

it is different both in its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action." *Gardner v. Florida*, 430 U.S. 349, 357 (1977). The qualitative difference of death from all other punishments requires a correspondingly greater need for reliability, consistency, and fairness in capital sentencing decisions. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion. *Gardner*, 430 U.S. at 357. Accordingly, the courts must "carefully scrutinize" sentencing decisions "to minimize the risk that the penalty will be imposed in error or in an arbitrary and capricious manner. There must be a valid penological reason for choosing from among the many criminal defendants the few who are sentenced to death." *Spaziano*, 468 U.S. at 460 n.7. The death-is-different principle can only be observed here by holding that the inconsistent and disproportionate sentences in the same case violate the clearly established *Furman* arbitrariness principle and hence the Eighth Amendment.

In evaluating whether a death sentence is arbitrary, the Supreme Court has directed courts to evaluate a defendant's culpability both individually and in terms of the sentences of codefendants and accomplices *in the same case*. *Enmund v. Florida*, 458 U.S. 782, 788, 798 (1982). In *Enmund*, the Supreme Court found a violation of the Eighth Amendment when defendants with "plainly different" culpability received the same capital sentence. The Court required proportionality comparison with others participating in the same crime:

> Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the Kerseys. This was impermissible under the Eighth Amendment.

*Id.* at 798.

The instant case presents the situation where the defendant with the lesser culpability received the harsher sentence — the death penalty. Numerous state courts have applied the *Enmund* principle to require reasonable symmetry between culpability and the sentencing of codefendants. *See*, *e.g.*, *People v. Kliner*, 705 N.E.2d 850, 897 (Ill. 1998) ("[S]imilarly situated codefendants should not be given arbitrarily or unreasonably disparate sentences.");

*Larzelere v. State*, 676 So. 2d 394, 406 (Fla. 1996) ("When a codefendant . . . is equally as culpable or more culpable than the defendant, disparate treatment of the codefendant may render the defendant's punishment disproportionate."); *Hall v. State*, 244 S.E.2d 833, 839 (Ga. 1978) ("We find that . . . the death sentence, imposed on Hall for the same crime in which the co-defendant triggerman received a life sentence, is disproportionate."). Similarly, the Federal Death Penalty Act recognizes that a comparison of the sentences received by codefendants is required. *See* 18 U.S.C. § 3592(a)(4) (listing as a mitigating factor the lack of death sentences for equally or more culpable codefendants).

The principle requiring rational, *proportionate punishment* is the essence of the rule of law. It has deep roots in our cultural and biological heritage. Aristotle observed in the *Nicomachean Ethics* that basic notions of justice require treating like cases alike:

> If, then, the unjust is unequal, the just is equal, as all men suppose it to be, even apart from argument. . . . This, then, is what the just is — the proportional; the unjust is what violates the proportion. . . . [I]t is by proportionate requital that the city holds together.

Aristotle, *Ethica Nichomachea, in The Works of Aristotle* V.3.1131a-1131b, V.5.1132b (W.D. Ross ed. & trans. 1954). In a recent article, Judge Morris Hoffman and Timothy Goldsmith, a distinguished Yale biologist, make this point:

> [I]t is not surprising that collectively we struggle to balance the form and amount of punishment that is appropriate, a struggle that lies at the heart of what we mean by "justice." . . . .

> The two faces of justice — to deal firmly with transgressors, but not too harshly — reflect an intrinsic human sense of fairness and are important to the political ideal of equality. When Aristotle commands that like cases be treated alike, he is touching both on the personal notion that none of us wants to be punished more than anyone else (and therefore on our self-interest) and on the social notion that none of us wants to punish others more than they deserve (and therefore on the equilibrium between our inclination to punish and our intuitions about fairness and sympathy).

Morris B. Hoffman & Timothy H. Goldsmith, *The Biological Roots of Punishment*, 1 Ohio St. J. Crim. L. 627, 638-39 (2004).

In another instance of obfuscation, the majority argues that the Supreme Court's decision in *Pulley v. Harris*, 465 U.S. 37 (1984), precludes our consideration of the "comparative proportionality" of sentences in this case. *Pulley's* holding has nothing to do with this case. *Pulley* simply held that the Eighth Amendment does not require a state supreme court to systematically review the comparative proportionality of sentences in other cases unrelated to the case at hand. *Id.* at 50-51. *Pulley* concerned whether the Eighth Amendment mandates in every case a proportionality review of a particular death sentence in comparison with the punishment imposed on others for the same general type of crime in unrelated cases. Our holding neither contradicts this rule nor requires systematic comparative proportionality review of unrelated cases. Instead, we simply adhere to the clearly established, common sense principle of *Enmund* that, in a capital case with respect to the *very same* crime stemming from the *very same* facts, the Eighth Amendment does not permit the codefendant with less culpability to receive the death penalty when the codefendant with greater culpability receives a lesser sentence. The majority's view is in conflict with the holding of *Enmund* and allows the less culpable participant in the same criminal episode to receive the death penalty when the more culpable participant receives the lesser sentence.

Thus both the ancient rule invalidating inconsistent conspiracy verdicts and the modern rule directly phrased in terms of consistency, rationality and proportionality require the conclusion that Getsy's death verdict should be set aside.

ENTERED BY ORDER OF THE COURT

/s/ Leonard Green

_____

Clerk